## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| FEDERAL HOME LOAN MORTGAGE CORPORATION,<br>    8200 Jones Branch Drive<br>    McLean, Virginia 22102<br><br>            Plaintiff,<br><br>    v.<br><br>TWIN CITY FIRE INSURANCE COMPANY,<br>    One Hartford Plaza<br>    Hartford, Connecticut 06155<br><br>AXIS REINSURANCE COMPANY,<br>    10000 Avalon Boulevard Suite 200<br>    Alpharetta, Georgia 30009<br><br>HOUSTON CASUALTY COMPANY,<br>    13403 Northwest Freeway<br>    Houston, Texas 77040<br><br>            AND<br><br>CERTAIN UNDERWRITERS AT LLOYD'S OF LONDON  SUBSCRIBING TO POLICY NO. 509/QA020707<br>    122 Leadenhall Street<br>    London, EC3V 4AB<br><br>            Defendants. | Case No.<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Federal Home Loan Mortgage Corporation ("Freddie Mac"), by and through its undersigned attorneys, hereby files this Complaint against Defendants Twin City Fire Insurance Company ("Hartford"), AXIS Reinsurance Company ("AXIS"), Houston Casualty Company ("HCC"), and Certain Underwriters at Lloyd's of London subscribing to Policy No.

509/QA020707 ("Lloyd's") (collectively, the "Defendant Insurers") and in support thereof, alleges as follows:

## NATURE OF THE CASE

1.    Beginning in 2007, in the midst of the financial crisis, Freddie Mac and its directors and officers became the subject of various civil lawsuits and shareholder demand letters, in connection with Freddie Mac's representations in securities filings, information statements, and statements to investors.  In total, twelve civil lawsuits were filed against Freddie Mac and/or its directors and officers, and three shareholder demand letters were issued (the "Civil Suits").  These Civil Suits generally concerned Freddie Mac's alleged exposure to "subprime" and/or "Alt-A" loans, its risk management controls, underwriting standards and practices, capital adequacy, loan loss reserves, and related disclosures.  Freddie Mac and the directors and officers retained counsel and defended themselves against these suits.  Several months after the first Civil Suits were initiated, the SEC commenced an investigation of certain of the officers, directors, and/or employees of Freddie Mac as well as Freddie Mac itself (the "SEC Investigation").  As part of the SEC Investigation, 36 of Freddie Mac's officers, directors, and/or employees received subpoenas from the SEC demanding that they produce documents and provide testimony under oath.  The SEC Investigation and the Civil Suits proceeded simultaneously until the SEC Investigation concluded with a non-prosecution agreement between the SEC and Freddie Mac and with the SEC's initiation of a lawsuit (the "SEC Lawsuit") in December 2012, against certain former Freddie Mac officers.  The SEC Lawsuit and the Civil Suits all involved similar, and in some cases identical, factual and legal allegations.  One of the Civil Suits continues to this day.  The Defendant Insurers have conceded that the SEC Lawsuit and the Civil Suits are covered claims under their respective policies, but have denied or refused to acknowledge coverage for expenses that Freddie Mac incurred on behalf of Freddie Mac officers, directors, and employees subpoenaed by the SEC

during its Investigation and Lawsuit or incurred during the SEC Investigation on work that furthered Freddie Mac's defense of the covered Civil Suits. They have also improperly rejected certain expenses for covered claims and breached their obligations regarding when indemnification payments are due under the policies.

2. At all times relevant to this action, Freddie Mac had in place directors and officers ("D&O") insurance. Freddie Mac's D&O insurance provides coverage for, among other things, Freddie Mac's expenses related to shareholder and derivative matters as well as costs Freddie Mac incurs to defend insured directors, officers and employees in a civil lawsuit or an SEC investigation. After commencement of the Civil Suits, the SEC Investigation, and the SEC Lawsuit Freddie Mac provided timely notice of its claims under these D&O policies and, in response, its primary through fourth-level excess insurers have all paid their limits. Freddie Mac also satisfied a substantial self-insured retention, or deductible, under the policies.

3. The Defendant Insurers now seek a windfall by taking the position that millions of dollars in e-discovery costs, legal fees, and other defense expenses (the "Unreimbursed Costs") are uncovered because they were incurred during the time period of the SEC Investigation of Freddie Mac itself or during the SEC Lawsuit, because they contend that the policies' clear coverage for subpoenas only applies to witnesses who have been pre-designated by the SEC as a target, or because certain expenses allegedly violate billing guidelines that are nowhere referenced in the policies. This is despite the fact that: a) the Unreimbursed Costs include legal fees incurred in defending covered employees, directors, and officers who received SEC subpoenas and in defending the covered Civil Suits, and costs for e-discovery efforts—the collection and storage of documents and data—that were required for (and first initiated in response to) fully covered claims; and b) the SEC Investigation concerned the very same topics already at issue in the Civil

Suits and by court order information obtained during the SEC Investigation had to be produced in at least one of the covered Civil Suits.  The Defendant Insurers wrongly contend that a subpoena issued by the SEC to a Freddie Mac employee is not a covered claim (despite express policy language to the contrary).  The Defendant Insurers also contend that the SEC Investigation was an uncovered investigation of Freddie Mac only and that, if any work on any covered Civil Suit also benefitted in any way the purportedly uncovered SEC Investigation, costs for that work are not covered by the policies.  The Defendant Insurers take this position despite policy language that directly addresses such a scenario and requires an allocation and coverage of shared covered and uncovered claims.

4.      The Unreimbursed Costs are covered under the Defendant Insurers' respective policies.  Freddie Mac seeks declaratory relief requiring the Defendant Insurers to honor their coverage obligations, and damages associated with Hartford's breach of contract.

## THE PARTIES

5.      Plaintiff Federal Home Loan Mortgage Corporation ("Freddie Mac") is a shareholder-owned government-sponsored enterprise, existing pursuant to the Federal Home Loan Mortgage Corporation Act, Title III of the Emergency Home Finance Act of 1970, 12 U.S.C. §§ 1451–1459.  Plaintiff maintains its headquarters and principal place of business at 8200 Jones Branch Drive, McLean, Virginia 22102.

6.      Freddie Mac was created by Congress in 1970 to promote liquidity, stability and affordability for the United States mortgage market.  In furtherance of its mission, Freddie Mac contracts with mortgage sellers and services, who sell mortgage loans to and service mortgage loans for Freddie Mac.  Freddie Mac was placed in conservatorship under the Federal Housing Finance Agency on September 8, 2008, pursuant to 12 U.S.C. § 4617(a).

7.     Defendant Twin City Fire Insurance Company ("Hartford") is a corporation organized and existing under the laws of Indiana, with its principal place of business in Connecticut.

8.      Defendant AXIS Reinsurance Company ("AXIS") is a corporation organized and existing under the laws of New York, with its principal place of business in Georgia.

9.     Defendant Houston Casualty Company ("HCC") is a corporation organized and existing under the laws of Texas, with its principal place of business in Texas.

10.    Defendant Certain Underwriters at Lloyd's of London subscribing to Policy No. 509/QA020707 ("Lloyd's") are individuals or companies engaged in insurance underwriting with their principal place of business in London, England.

## JURISDICTION AND VENUE

11.    The Court has jurisdiction under 12 U.S.C. § 1452(f), which provides that "all civil actions to which [Freddie Mac] is a party shall be deemed to arise under the laws of the United States, and the district courts of the United States shall have original jurisdiction of all such actions, without regard to amount or value."

12.    This Court has personal jurisdiction over Defendant Insurers pursuant to, *inter alia*, Defendant Insurers' (i) transaction of business within the District of Columbia; (ii) contracting to supply services in the District of Columbia; and/or (iii) contracting to insure or act as surety for or on any person, property, risk contract, obligation, or agreement located, executed, or to be performed within the District of Columbia.  D.C. Code § 13-423.

13.    Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims herein occurred in this district.  Among other things, Freddie Mac is a government-sponsored enterprise, created in Washington, D.C. by an act of Congress and operating pursuant to a congressional charter; and many of the acts at issue

in the underlying Civil Suits and SEC Investigation, and SEC Lawsuit occurred in Washington, D.C., including alleged misrepresentations in testimony before Congress, a Congressional investigation, and information statements and filings submitted to the SEC in Washington, D.C. Further, the vast majority of the depositions and interviews of certain Freddie Mac directors and officers taken in connection with, or used in, the Civil Suits, SEC Investigation, and SEC Lawsuit, the costs of which are the subject of this lawsuit, occurred in Washington, D.C. Defendant Insurers transact business in this District, and Defendant Insurers are subject to personal jurisdiction in this District. Freddie Mac also maintained an office in Washington, D.C. during the time in which Freddie Mac incurred the expenses at issue in this case.

## THE POLICIES

14. Each of the Defendant Insurers issued one or more of the excess D&O insurance policies (the "Excess Policies") insuring Freddie Mac and its officers and directors identified in Paragraphs 17 through 20 of this Complaint. The Excess Policies provide broad coverage for Loss, including Defense Costs for Claims, which encompass actions alleging Wrongful Acts by Insured Persons, and Defense Costs for Securities Claims, which encompass actions alleging Wrongful Acts by the Organization (i.e., Freddie Mac). Claims include a civil, criminal, administrative, or regulatory investigation of an Insured Person; and in the case of an investigation by the SEC, the service of a subpoena upon such Insured Person. Securities Claims include the Civil Suits at issue here.

15. The insurers providing coverage to Freddie Mac are led by National Union Fire Insurance Company of Pittsburgh Pennsylvania ("National Union"), which is not a party to this action. National Union sold to Freddie Mac a primary D&O liability policy, No. 110-66-40 (the "National Union Primary Policy"), for the policy period June 1, 2007 to June 1, 2008. The National Union Primary Policy provides a $25 million Limit of Liability excess of a $25 million

self-insured retention.  Other insurance policies, including the policies at issue in this case and those that have already fully exhausted their coverage, follow form to the National Union Primary Policy.  National Union paid the full limits of its coverage for costs incurred.  A true and correct copy of the National Union Primary Policy is attached hereto as Exhibit A and is incorporated herein.

16.     A number of other insurers that also are not parties to this action sold to Freddie Mac first-layer, second-layer, third-layer, and fourth-layer excess D&O liability policies for the policy period June 1, 2007 to June 1, 2008 (the "Underlying Excess Policies").  Unlike the Defendant Insurers, the insurers issuing the Underlying Excess Policies honored their obligations and paid the full limits of their coverage for costs incurred in connection with the Civil Suits, the SEC Investigation, and/or the SEC Lawsuit.  The Underlying Excess Policies collectively provide $60 million in Limits of Liability excess of the underlying limits.

17.     Defendant Hartford sold to Freddie Mac a fifth-layer excess D&O liability policy, No. 00DA0200687-07, for the policy period June 1, 2007 to June 1, 2008 (the "Hartford Policy"). The Hartford Policy provides a $15 million Limit of Liability excess of the underlying limits.  As of October 25, 2022, after a substantial delay in paying any coverage, Hartford has paid approximately $7.3 million of coverage for expenses incurred after the SEC Investigation concluded, but improperly has denied paying for Unreimbursed Costs incurred during the time period of the SEC Investigation.  A true and correct copy of the Hartford Policy is attached hereto as Exhibit B and is incorporated herein.

18.     Defendant AXIS sold to Freddie Mac a sixth-layer excess D&O liability policy, No. RNN711796/01/2007, for the policy period June 1, 2007 to June 1, 2008 (the "AXIS Policy"). The AXIS Policy provides a $10 million Limit of Liability excess of the underlying limits.  AXIS

has refused to acknowledge coverage for the Unreimbursed Costs or pay any covered expenses at issue in this case. A true and correct copy of the AXIS Policy is attached hereto as Exhibit C and is incorporated herein.

19. Defendant HCC sold to Freddie Mac a seventh-layer excess D&O liability policy, No. 24-MG-07-A8638, for the policy period June 1, 2007 to June 1, 2008 (the "HCC Policy"). The HCC Policy provides a $10 million Limit of Liability excess of the underlying limits. HCC has refused to acknowledge coverage for the Unreimbursed Costs or pay any covered expenses at issue in this case. A true and correct copy of the HCC Policy is attached hereto as Exhibit D and is incorporated herein.

20. Defendant Lloyd's sold to Freddie Mac an eighth-layer excess D&O liability policy, No. 509/QA020707 (the "Lloyd's Policy"). The Lloyd's Policy provides a $10 million Limit of Liability excess of the underlying limits. In addition to the Lloyd's Policy at issue in this dispute, Lloyd's also sold to Freddie Mac another excess policy, No. 509/QA052207, which is one of the Underlying Excess Policies. Lloyd's conceded coverage for the Civil Suits and SEC Lawsuit and paid its full limits of coverage under that Underlying Excess Policy. Lloyd's has nonetheless refused to acknowledge coverage under the Lloyd's Policy for the Unreimbursed Costs or pay any covered expenses at issue in this case. A true and correct copy of the Lloyd's Policy is attached hereto as Exhibit E and is incorporated herein.

21. Collectively, the National Union Policy, the Underlying Excess Policies, and the Excess Policies are referred to as the "Policies."

22. Freddie Mac has paid all required insurance premiums for the Policies.

23. Freddie Mac has satisfied all terms and conditions of the Policies.

24.    The limits of all Underlying Excess Policies as well as the National Union Primary Policy have been properly exhausted.

25.    The Policies were in full force and effect at all pertinent times.

### FACTUAL BACKGROUND

**I.    The Insurance Coverage**

26.    National Union issued the National Union Policy, a primary D&O insurance policy, to Freddie Mac.  With exceptions not relevant here, the Excess Policies, like the Underlying Excess Policies, follow the terms and conditions of the National Union Primary Policy, including those described in more detail below.

27.    The National Union Primary Policy states that "This policy shall pay the **Loss** of any **Organization** arising from a **Securities Claim** made against such **Organization** for any **Wrongful Act** of such **Organization**."  Ex. A at 5.  The National Union Primary Policy also states, "This policy shall pay the **Loss** of an **Organization** arising from a **Claim** made against an **Insured Person** (including an **Outside Entity Executive**) for any **Wrongful Act** of such **Insured Person**, but only to the extent that such **Organization** has indemnified such **Insured Person**."  *Id.*

28.    The National Union Primary Policy defines "**Organization**" to mean, in relevant part, "the **Named Entity**."  *Id.* at 9.  Federal Home Loan Mortgage Corporation is the "Named Entity" on the National Union Primary Policy. *Id.* at 1.  The National Union Primary Policy defines "**Insured Person**" to mean, in relevant part, any "(1) **Executive** of an **Organization**; [or] (2) **Employee** of an **Organization**."  *Id.* at 8.  The National Union Primary Policy defines "**Executive**" to mean, in relevant part, any "past, present and future duly elected or appointed director, officer, trustee or governor of a corporation, management committee member of a joint venture and member of the management board of a limited liability company (or equivalent position)."  *Id.* at 7.  The National Union Primary Policy defines "**Employee**" to mean "any past, present or future

employee, other than an **Executive** of an **Organization**, whether such employee is in a supervisory, co-worker or subordinate position or otherwise, including any full-time, part-time, seasonable and temporary employee." *Id.* at 6.

29.     The National Union Primary Policy defines "**Claim**" as "a written demand for monetary, non-monetary or injunctive relief," "a civil, criminal, administrative, regulatory or arbitration proceeding for monetary, non-monetary or injunctive relief which is commenced by . . . service of a complaint or similar pleading," or "a civil, criminal, administrative or regulatory investigation of an **Insured Person** . . . once such Insured Person is identified in writing by such investigating authority as a person against whom a proceeding . . . may be commenced" or "in the case of an investigation by the SEC . . . after the service of a subpoena upon such **Insured Person**." *Id.* at 6, 45.  "The term '**Claim**' shall include any **Securities Claim** . . . ." *Id.* at 6.

30.     The National Union Primary Policy defines "**Securities Claim**" to include "a **Claim**, other than an administrative or regulatory proceeding against, or investigation of an **Organization**, made against any **Insured** . . . alleging a violation of any federal, state, local or foreign regulation, rule or statute regulating securities." *Id.* at 9.  "Notwithstanding the foregoing, the term '**Securities Claim**' shall include an administrative or regulatory proceeding against an **Organization**, but only if and only during the time that such proceeding is also commenced and continuously maintained against an **Insured Person**." *Id.*

31.     The National Union Primary Policy defines "**Loss**" to include Defense Costs. *Id.* at 8.  The National Union Primary Policy defines "**Defense Costs**" as "reasonable and necessary fees, costs and expenses consented to by the **Insurer** . . . resulting solely from the investigation, adjustment, defense and/or appeal of a **Claim** against an **Insured**." *Id.* at 6.  The National Union

Primary Policy provides that an Insurer's consent to Defense Costs may not be "unreasonably withheld." *Id.* at 14.

32.     The National Union Primary Policy states that with respect to "(i) **Defense Costs** jointly incurred by; (ii) any joint settlement entered into by; and/or (iii) any adjudicated judgment of joint and several liability against any **Organization** and any **Insured** in connection with any **Claim** other than a **Securities Claim,** any such **Organization** and any such **Insured** and the **Insurer** agree to use their best efforts to determine a fair and proper allocation of the amounts as between any such **Organization**, any such **Insured** and the **Insurer**.  In the event that a determination as to the amount of **Defense Costs** to be advanced under the policy cannot be agreed to, then the **Insurer** shall advance **Defense Costs** excess of any applicable retention amount which the Insurer states to be fair and proper until a different amount shall be agreed upon or determined pursuant to the provisions of this policy and applicable law." *Id.* at 62.

33.     The National Union Primary Policy requires that "the **Insurer** shall advance . . . covered **Defense Costs** no later than ninety (90) days after the receipt by the **Insurer** of such defense bills." *Id.* at 14.

34.     The National Union Primary Policy provides that each party "waives any objection to using the laws of the Commonwealth of Virginia." *Id.* at 71.

## II.    **The Insurance Dispute**

### A.    **The Financial Crisis Begins and Covered Civil Suits Are Filed Against Freddie Mac Based on Alleged Misrepresentations and Omissions**

35.     Beginning in late 2007, and in the midst of the financial crisis, Freddie Mac and certain of its directors and officers became the subject of various civil lawsuits and shareholder demand letters (the Civil Suits described above) alleging that Freddie Mac misrepresented to investors its subprime mortgage holdings.  There is no dispute these lawsuits are covered.

36.     The first of these Civil Suits, *Reimer v. Federal Home Loan Mortgage Corporation, et al.*, 1:07-cv-10526 (S.D.N.Y.) ("*Reimer*"), a securities class action, was filed against Freddie Mac and various Insured Persons as defined under the Excess Policies on November 21, 2007. *Reimer* was followed by a number of additional Civil Suits, including shareholder demand letters, all of which generally concerned Freddie Mac's alleged exposure to "subprime" and/or "Alt-A" loans, its risk management controls, underwriting standards and practices, capital adequacy, loan loss reserves, and related disclosures.  The other covered Civil Suits are:

- Esther Sadowsky Testamentary Trust shareholder demand letter, issued November 21, 2007;

- Bassman shareholder demand letter, issued December 6, 2007;

- *Ohio Public Employee Retirement System v. Freddie Mac, et al.*, No. 4:08-cv-0160 (N.D. Ohio), filed January 18, 2008;

- *Bassman v. Syron, et al.*, No. 1:08-cv-02423 (S.D.N.Y.), filed March 10, 2008;

- Adams Family Trust and Kevin Tashjan shareholder demand letter, issued March 26, 2008;

- *Esther Sadowsky Testamentary Trust v. Syron, et al.*, No. 1:08-cv-05221 (S.D.N.Y.), filed June 6, 2008;

- *Adams Family Trust, et al. v. Syron, et al.*, No. 1:08-cv-00773 (E.D. Va.), filed July 24, 2008;

- *Louisiana Municipal Police Employees Retirement System v. Syron, et al.*, No. 1:08-cv-00849 (E.D. Va.), filed August 15, 2008;

- *Kuriakose, et al. v. Freddie Mac, et al.*, No. 1:08-cv-07281 (S.D.N.Y.), filed August 15, 2008;

- *Mark v. Goldman Sachs & Co., et al.*, No. 1:08-cv-08181 (S.D.N.Y.), filed September 23, 2008;

- *Jacoby v. Syron, et al.*, No. 1:08-cv-10894 (S.D.N.Y.), filed December 15, 2008;

- *Kreysar v. Syron, et al.*, No. 1:09-cv-00832 (S.D.N.Y.), filed January 29, 2009;

- *Liberty Mutual Insurance Co., et al. v. Goldman Sachs & Co., et al.*, No. 1:09-cv-10668 (D. Mass.), filed April 6, 2009;

- *Smith v. Freddie Mac, et al.*, No. 3:09-cv-02085 (S.D. Cal.), filed August 24, 2009;

- *SEC v. Syron, et al.*, No. 1:11-cv-09201 (S.D.N.Y), filed December 16, 2011.

37.     Because of these Civil Suits, Freddie Mac had a need and a legal obligation to preserve all potentially relevant documents, and began to do so promptly, issuing its first litigation hold shortly after the first of the Civil Suits was commenced.  Freddie Mac began document collection thereafter and established a Special Litigation Committee on January 31, 2008.  By September 26, 2008, ten Civil Suits—all Claims under the Excess Policies—had been initiated and Freddie Mac had collected potentially relevant documents from 230 custodians (the "ESI").  As part of its defense of the Civil Suits, Freddie Mac retained one or more electronic discovery vendors that processed, stored, and facilitated the review of the ESI for a fee.  Through the vendor(s), outside counsel representing Freddie Mac and the individual defendants in the covered Civil Suits had access to the ESI and used that access to investigate the allegations of the covered Civil Suits and to defend their clients, all of whom were Insured Persons under the Excess Policies.

**B.     The SEC Commences an Investigation of Freddie Mac and Certain of Its Officers, Directors, and/or Employees as Civil Suits Continue to Be Filed**

38.     On September 26, 2008, almost a year after the first Civil Suit was filed, and after Freddie Mac had collected ESI for the Civil Suits, the SEC commenced the SEC Investigation into certain Freddie Mac officers, directors, and/or employees and Freddie Mac itself.  On that date, the SEC sent Freddie Mac a letter stating that it was "conducting an inquiry to determine whether there has been any violation of the federal securities laws in connection with the accuracy of the financial statements and other public disclosures made by [Freddie Mac] for the period July 1, 2007 through September 7, 2008."  Those disclosures were, of course, made or approved by individuals at Freddie Mac.  In its letter, the SEC stated that the commencement of the SEC

Investigation did not mean that the SEC had concluded that "Freddie Mac or anyone has broken the law" or that the SEC had a "negative opinion of any person, entity, or security." The SEC Investigation, like the Civil Suits, concerned Freddie Mac's alleged exposure to "subprime" and/or "Alt-A" loans, its risk management controls, underwriting standards and practices, capital adequacy, loan loss reserves, and related disclosures.

39.     On January 8, 2009, as part of the SEC Investigation, the SEC issued an Order Directing Private Investigation and Designating Officers to Take Testimony In the Matter of Freddie Mac ("SEC Order"). The SEC Order stated that "Freddie Mac," as well as "its officers, directors, employees, partners, subsidiaries, and/or affiliates, and/or other persons or entities," may have violated the Securities Act, the Securities Exchange Act, and the Securities Exchange Act Rules. The SEC Order declared that, in light of the foregoing, a private investigation would be made to determine whether any "persons or entities" had engaged in, or were about to engage in, any possibly unlawful act.

40.     In June 2009, as part of the SEC Investigation, the SEC began serving subpoenas on Freddie Mac employees. Ultimately the SEC served 36 separate subpoenas to 36 separate Freddie Mac Insured Persons. Each of the subpoenas demanded that a Freddie Mac Insured Person produce documents to the SEC and appear at a specific time and place to testify under oath or affirmation. In response to the subpoenas, Freddie Mac Insured Persons appeared for 44 formal interviews in which the Insured Persons were placed under oath and their testimony transcribed. The interviews began in June 2009 and lasted through December 2010. In response to the subpoenas, Freddie Mac Insured Persons made at least 27 separate document productions. The Insured Persons' document productions began in August 2009 and lasted through October 2010. Freddie Mac incurred Defense Costs as a result of these subpoenas, interviews, and document

productions related to the subpoenas, all of which are covered by the Excess Policies.  Defendant Insurers have nonetheless denied coverage and refused to reimburse these covered expenses.

41.     On March 10, 2011, the SEC issued so-called "Wells Notices" to Freddie Mac and to three Insured Persons.  Each Wells Notice informed the recipient that the SEC Enforcement Division staff had decided to recommend that the SEC bring an enforcement proceeding, identified alleged violations of the securities laws, and provided the recipient with the opportunity to make a responsive submission.  Freddie Mac incurred Defense Costs as a result of these Wells Notices, which are covered by the Excess Policies.  Defendant Insurers have nonetheless denied coverage and refused to reimburse these covered expenses.

42.     The same counsel who represented Freddie Mac in the Civil Suits represented Freddie Mac and most of the subpoenaed Insured Persons in the SEC Investigation and SEC Lawsuit.  Counsel spent considerable time and, as a result, Freddie Mac incurred considerable costs, working to defend subpoenaed Freddie Mac Insured Persons.  This work included, but was not limited to, the collection, review, and production of documents, the preparation of subpoenaed Insured Persons for SEC testimony, and the defense of the depositions and interviews.  Additionally, because the subject matter, witnesses, relevant documents, the Civil Suits, and the SEC Investigation, and the SEC Lawsuit overlapped so significantly, the work done by counsel served the defense of the covered Civil Suits as well.  For example, all documents provided to the SEC as part of the SEC Investigation and Lawsuit and transcripts of all sworn testimony taken during the SEC Investigation and Lawsuit were required by court order to be produced in *Ohio Public Employees Retirement System v. Federal Home Loan Mortgage Corp., et al.* ("OPERS"), one of the Civil Suits.  Thus, any adverse testimony given to the SEC would adversely affect a key

Civil Suit.  Additionally, counsel for covered Insureds extensively used the same collected ESI for their work on the Civil Suits and the SEC Investigation and Lawsuit.

### C.      The Conclusion of the SEC Investigation and Subsequent Developments

43.      The SEC Investigation concluded on December 5, 2011.  On that date, Freddie Mac and the SEC entered into a Non-Prosecution Agreement under which the SEC agreed not to bring an enforcement action or proceeding against Freddie Mac regarding disclosures Freddie Mac made from late 2006 through September 6, 2008, about, among other things, its alleged exposure to "subprime" and "Alt-A" mortgages.  The next day, the SEC filed the SEC Lawsuit—*SEC v. Syron, et al.*, No. 11-cv-09201 (S.D.N.Y.).  The SEC Lawsuit named three Insured Persons—Richard Syron, Patricia Cook, and Donald Bisenius, all three of whom had previously received subpoenas—as defendants.

44.      Freddie Mac has now resolved all but one of the Civil Suits, either through dismissal or relatively minor settlement amounts, including the SEC Lawsuit.  The insurers were kept apprised of developments in the Civil Suits and lower-level insurers approved and paid for the settlements and the attendant costs and expenses to the full limit of their respective policies.  Only one Civil Suit, OPERS, which includes Freddie Mac and individual Insured Persons as defendants, continues to this day.

### D.      The Defendant Insurers Refuse to Cover Freddie Mac's Losses

45.      Freddie Mac provided timely written notice of the Civil Suits, the SEC Investigation, and the SEC Lawsuit to all of its insurers.

46.      National Union, the first-level excess insurer, and the second-level excess insurer exhausted their limits paying costs incurred in defending the above claims.  In its coverage position letters, National Union—which issued the primary policy that all other policies followed— acknowledged that Freddie Mac's cost to defend a director, officer or employee are covered once

such individual receives an SEC subpoena.  In doing so, National Union recognized a key policy distinction between SEC investigations and other government investigations, stating in a letter dated October 16, 2013 that "[c]overage for advancement of Defense Costs may commence for the SEC investigation as to Insured Persons upon service of an SEC subpoena *and for other investigations* once such Insured Person is identified in writing by such investigating authority as a person against when [sic] a proceeding described in part (b)(2) of the definition or [sic] Claim may be commenced" (emphasis added).

47.   On March 22, 2017, Freddie Mac's second-level excess insurer, XL Specialty Insurance Co. ("XL"), paid approximately $3.5 million (the remainder of its $15 million limit) as reimbursement for e-discovery costs accrued from 2012 to 2016.

48.   On August 18, 2017, Freddie Mac's third-level excess insurer, American Casualty Company of Reading, Pa. ("American Casualty"), agreed to pay its full $15 million limit to Freddie Mac, specifying that approximately $14 million was for historic Unreimbursed Costs.  Freddie Mac allocated the payment to the earliest incurred costs.

49.   On May 9, 2018, Freddie Mac's fourth-level excess insurer, St. Paul Mercury Insurance Company ("St. Paul"), paid its $15 million limit toward costs incurred after the SEC Investigation ended.

50.   After these payments, there remained Unreimbursed Costs consisting of e-discovery costs, legal fees, and other costs necessary to the defense of subpoenaed Insured Persons in the SEC Investigation and also of the covered Civil Suits and SEC Lawsuit.  The Unreimbursed Costs were incurred during and after the SEC Investigation.

51.   The Civil Suits and the SEC Investigation of Insured Persons and depositions of Insured Persons during the SEC Lawsuit are covered Claims within the definition of the Excess

Policies.  The costs incurred in defense of the Civil Suits, SEC Lawsuit, and/or the SEC Investigation of Insured Persons are covered under the Excess Policies.  Additionally, the costs incurred in defense of the SEC Investigation also are reasonably related and necessary to the defense of these covered Civil Suits and thus covered under the Excess Policies.  No exclusions or other limitations in the Excess Policies apply to bar or limit coverage.

52.     Hartford has refused to acknowledge coverage for the Unreimbursed Costs, instead, denying coverage under the Hartford Policy for the Unreimbursed Costs, and has refused to pay Freddie Mac for such costs.  In so doing, Hartford has taken the incorrect position that no costs incurred during the time period of the SEC Investigation are covered, even if those costs were incurred in the defense of Insured Persons who received SEC subpoenas or were costs necessary to the defense of covered Civil Suits.  As evidenced by its actions in this matter and contrary to the requirements of the Hartford Policy, Hartford has made no attempt to allocate shared costs for covered claims and those claims that it contends are uncovered from the time period of the SEC Investigation.  While denying payment of e-discovery database costs for covered claims up until December 15, 2011 (the date the SEC Investigation concluded), Hartford has indemnified Freddie Mac's costs for the same database since December 16, 2011.  Further, although Hartford has issued payment under the Hartford Policy for certain costs relating to the Civil Suits, many of these payments were wrongfully withheld until well after the 90-day deadline for payment imposed by the Hartford Policy, breaching the terms of the contract.

53.     Upon information and belief, AXIS, HCC, and Lloyd's are following Hartford's coverage position regarding the Unreimbursed Costs.  As a result, unlike the lower-level insurers, all of the Defendant Insurers have wrongfully refused to honor their contractual obligations under

the policies.  The Defendant Insurers' actions have forced Freddie Mac to pay Defense Costs of over $32 million without the contractually required assistance and reimbursement of its Insurers.

54.     Beginning in 2013, and continuing to the present day, Freddie Mac and the Defendant Insurers entered into a series of agreements tolling the statute of limitations applicable to any mediation, arbitration, litigation, or other proceeding for resolution of disputes about coverage for the Unreimbursed Costs.

## FIRST CLAIM FOR RELIEF
### (Declaratory Judgment Against All Defendant Insurers)

55.     Freddie Mac restates and re-alleges all of the foregoing paragraphs of this Complaint, as though fully set forth herein.

56.     Freddie Mac has fully complied with all of the terms and conditions of the Excess Policies.

57.     A justiciable controversy exists between Freddie Mac and the Defendant Insurers as to their respective rights and obligations and the scope of coverage owed to Freddie Mac under the Excess Policies.

58.     Freddie Mac seeks a judicial determination to resolve a present justiciable controversy among the parties regarding coverage under the Excess Policies.

59.     Freddie Mac is entitled to a judicial declaration by the Court that the Defendant Insurers are obligated to pay the Unreimbursed Costs, subject to the limits of the Defendant Insurers' respective policies.

60.     The issuance of declaratory relief by this Court will terminate some or all of the existing controversy among the parties.

## SECOND CLAIM FOR RELIEF
(Breach of Contract Against Hartford)

61.     Freddie Mac restates and re-alleges all of the foregoing paragraphs of this Complaint, as though fully set forth herein.

62.     Freddie Mac has fully complied with all of the terms and conditions of the Hartford Policy.

63.     Hartford has denied coverage for the Unreimbursed Costs under the Hartford Policy.

64.     Hartford's unreasonable refusal to agree to pay for its respective share of the Unreimbursed Costs constitutes a material breach of Hartford's obligations under the Hartford Policy.

65.     Hartford has repeatedly failed to make timely payment of invoices submitted to it, in breach of the terms of the Hartford Policy, which requires payment of invoices within 90 days of submission.

66.     Hartford's unreasonable delay in its payments to Freddie Mac constitutes a material breach of Hartford's obligations under the Hartford Policy.

67.     Hartford's breaches of the Hartford Policy has proximately caused Freddie Mac harm for which Freddie Mac is entitled to damages according to proof.

68.     By reason of the foregoing, Hartford is liable to Freddie Mac for the amount of the Unreimbursed Costs and for additional damages that Freddie Mac has sustained and will sustain as a result of Hartford's breach of its contract. Such damages include, but are not limited to: amounts Freddie Mac has incurred in establishing the extent of its losses; consequential damages; pre- and post-judgment interest; and attorneys' fees, costs, and disbursements that Freddie Mac

has incurred to date and may incur in the future in prosecuting this action to obtain the benefit of its insurance coverage.

### THIRD CLAIM FOR RELIEF
(Breach of the Duty of Good Faith and Fair Dealing Against All Defendant Insurers)

69.     Freddie Mac restates and re-alleges all of the foregoing paragraphs of this Complaint, as though fully set forth herein.

70.     Va. Code § 38.2-209 provides in pertinent part that:

Notwithstanding any provision of law to the contrary, in any civil case in which an insured individual sues his insurer to determine what coverage, if any, exists under his present policy . . . the individual insured shall be entitled to recover from the insurer costs and such reasonable attorney fees as the court may award. However, these costs and attorney's fees shall not be awarded unless the court determines that the insurer, not acting in good faith, has either denied coverage or failed or refused to make payment to the insured under the policy. "Individual," as used in this section, shall mean and include any person, group, business, company, organization, receiver, trustee, security, corporation, partnership, association, or governmental body, and this definition is declaratory of existing policy.

71.     This action constitutes a suit by Freddie Mac to determine that coverage exists for the Unreimbursed Costs.

72.     The Defendant Insurers have not adjusted the loss in good faith and have refused and/or failed to make payment under the Excess Policies and have refused and/or failed to take such other actions as are necessary to adjust the loss in good faith.

73.     In addition to a judgment for the amount of the loss, Freddie Mac is entitled to payment of its costs and attorneys' fees herein pursuant to Va. Code § 38.2-209.  Freddie Mac is also entitled to general and consequential damages suffered as a result of the Defendant Insurers' breach of the duty of good faith.

## PRAYER FOR RELIEF

**WHEREFORE**, Freddie Mac respectfully requests an order as follows:

a.  Declaring that the Defendant Insurers are obligated to pay the Unreimbursed Costs, subject to the limits of the Defendant Insurers' respective policies.

b.  Awarding Freddie Mac compensatory and consequential damages for Hartford's breach of contract in an amount to be awarded at trial.

c.  Awarding Freddie Mac's costs and attorneys' fees for Defendant Insurers' bad faith conduct pursuant to Va. Code § 38.2-209, together with pre- and post-judgment interest thereon;

d.  Awarding Freddie Mac any other and further relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Freddie Mac hereby demands that this matter be heard before a jury on all issues so triable.


Dated: June 16, 2023

By:   /s/ *Matthew J. Schlesinger*

Matthew J. Schlesinger (D.C. Bar 429689)
Colin P. Watson (D.C. Bar 1032639)
COVINGTON & BURLING LLP
One CityCenter
850 Tenth Street NW
Washington, DC
(202) 662-6000
mschlesinger@cov.com
cpwatson@cov.com

Barry Parsons (D.C. Bar 454788)
Associate General Counsel
Freddie Mac
8200 Jones Branch Drive
McLean, VA 22102
703-903-2390
barry_parsons@freddiemac.com

*Attorneys for Plaintiff*