**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **FEDERAL HOME LOAN MORTGAGE CORPORATION**, | |
| Plaintiff, | |
| v. | Case No. 23-cv-1758-CRC |
| **TWIN CITY FIRE INSURANCE COMPANY, et al.**, | |
| Defendants. | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Since 2007, the Federal Home Loan Mortgage Corporation ("Freddie Mac" or "Freddie") has spent millions on the legal fallout from its connection to the subprime mortgage crisis. In this case, it seeks to recover some of those costs from certain of its "excess" insurers ("the Defendant Insurers"), whose coverage responsibilities kick in only when Freddie Mac's prior levels of insurance have been exhausted. Freddie now moves under Federal Rule of Civil Procedure 12(c) for partial judgment on the pleadings on two issues of contract interpretation. It asks the Court to hold as a matter of law, first, that a Freddie employee's receipt of an SEC subpoena is sufficient to trigger coverage under the applicable policy provisions regardless of whether the SEC is investigating the company or the employee individually, and second, that the Defendant Insurers cannot challenge a lower-layer insurer's coverage determination. The Court will deny Freddie's motion on the first issue. Recognizing coverage based solely on an SEC subpoena of a Freddie employee would ignore the differences in how the relevant policies cover costs stemming from claims against Freddie employees on the one hand and costs associated with claims against Freddie the entity on the other. But the Court will grant the motion on the

second issue. Excess insurers generally may not challenge an underlying insurer's payment, and the policies provide no exception to this default rule.

**I.    Background**

A. Factual Background

Freddie Mac is a shareholder-owned, government-sponsored enterprise that buys and sells mortgages in the U.S. secondary mortgage market. See Compl. ¶¶ 5–6. This case is about the interpretation of several excess directors and officers ("D&O") liability policies Freddie obtained during the mid-2000s financial crisis when it faced civil lawsuits, shareholder demand letters, and an SEC investigation and lawsuit stemming from its exposure to subprime loans.

*1. The Insurance Coverage*

D&O policies generally cover losses incurred when a company or its directors, officers, and employees are sued or investigated for actions taken by those individuals in their official capacities. Freddie Mac's primary D&O policy for the period between June 1, 2007, and June 1, 2008, was issued by National Union Fire Insurance Company of Pittsburgh, Pennsylvania ("National Union"). Id. ¶ 15. The policy covered $25 million in losses after Freddie had paid $25 million in losses. Id. Freddie also purchased additional layers of "excess" D&O insurance. See id. ¶¶ 16–20. Under an excess insurance policy, the insurer must provide coverage only after the limits of the policies layered below it have been exhausted. Relevant here, Freddie had third-layer coverage from American Casualty Company of Reading, Pennsylvania ("American Casualty"), for $15 million of losses exceeding $80 million; fourth-layer coverage from St. Paul Mercury Insurance Company for $15 million of losses exceeding $95 million; fifth-layer coverage from Twin City Fire Insurance Company ("Hartford") for $15 million of losses exceeding $110 million; sixth-layer coverage from AXIS Reinsurance Company ("AXIS") for

$10 million of losses exceeding $125 million; seventh-layer coverage from Houston Casualty

Company ("HCC") for $10 million of losses exceeding $135 million; and eighth-layer coverage

from certain underwriters at Lloyd's of London ("Lloyd's") for $10 million of losses exceeding

$145 million.  Pl.'s Mot. Partial J. on the Pleadings ("Mot."), Ex. 1 (June 2007–2008 D&O

Coverage Tower).  So, within this scheme, Lloyd's would have to provide coverage only if

Freddie had incurred more than $145 million in losses and already exhausted its policies with

American Casualty, St. Paul Mercury Insurance Company, Hartford, AXIS, and HCC.

These excess policies were "follow form" policies, which means they were subject to the

terms and conditions of the underlying National Union policy.  That policy provides two types of

coverage.  See Compl. ¶ 15.  "Coverage A"—called "Executive Liability Insurance"—covers

costs incurred by Freddie employees in defending claims against them that were not indemnified

(i.e., reimbursed) by the company.  Id., Ex. 1 ("National Union Policy"), at 6 (page numbers

designated by CM/ECF).  Coverage A is not implicated by Freddie's motion.  At issue is

"Coverage B"—called "Organization Insurance"—which covers costs incurred by Freddie itself

in two different situations.  Id.  Specifically, Coverage B of the policy provides:

> (i) Organization Liability:  This policy shall pay the **Loss** of any **Organization** arising from a **Securities Claim** made against such **Organization** for any **Wrongful Act** of such **Organization**.

> (ii) Indemnification of an Insured Person:  This policy shall pay the **Loss** of an **Organization** arising from a ***Claim made against*** an **Insured Person** (including an **Outside Entity Executive**) for any ***Wrongful Act*** of such **Insured Person**, but only to the extent that such **Organization** has indemnified such Insured Person.

Id. (boldface in original, italics added).  An "**Insured Person**" is an executive or employee of the

organization or an outside entity executive (collectively, "employees").  Id. at 9.  Therefore, to

simplify, the "Organization Insurance" section of the National Union Policy and the excess

policies (collectively, "the Policies") provide two types of coverage: (1) coverage for costs

incurred by Freddie directly arising from securities claims against the company (Coverage B(i))
and (2) coverage for costs incurred by Freddie to indemnify its employees for costs arising from
claims, not limited to securities claims, against those employees for their own wrongful acts
(Coverage B(ii)).

> The Policies define a "**Claim**" as:
>
> (1) a written demand for monetary, non-monetary or injunctive relief;
>
> (2) a civil, criminal, administrative, regulatory or arbitration proceeding for
> monetary, non-monetary or injunctive relief which is commenced by: (i) service
> of a complaint or similar pleading; (ii) return of an indictment, information or
> similar document (in the case of a criminal proceeding); (iii) receipt or filing of
> a notice of charges; or
>
> (3) a civil, criminal, administrative or regulatory *investigation of* an **Insured
> Person**:
>
>> (i) once such **Insured Person** is identified in writing by such investigating
>> authority as a person against whom a proceeding described in Definition
>> (b)(2) may be commenced; or
>>
>> (ii) *in the case of an investigation by the SEC or a similar state or foreign
>> government authority, after the service of a subpoena* upon such **Insured
>> Person**.

Id. at 7 (boldface in original, italics added).  And they define a "**Securities Claim**" as "a
**Claim**, other than an administrative or regulatory proceeding against, or investigation of
an **Organization**, made against any **Insured**" alleging a securities violation.  Id. at 10.
The Policies further provide that "[n]otwithstanding the foregoing, the term '**Securities
Claim**' shall include an administrative or regulatory proceeding against an
**Organization**, *but only if and only during the time that such proceeding is also
commenced and continuously maintained against an **Insured Person***."  Id. (boldface in
original, italics added).  In other words, the Policies cover an administrative or regulatory

investigation of Freddie—including an SEC investigation—*only if* there is also an

ongoing investigation of a Freddie employee.

Finally, the Policies define a "**Wrongful Act**" as:

(1) any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act or any actual or alleged **Employment Practices Violation**:

(i) with respect to any **Executive** of an **Organization**, by such **Executive** in his or her capacity as such or any matter claimed against such **Executive** solely by reason of his or her status as such;

(ii) with respect to any **Employee** of an **Organization**, by such **Employee** in his or her capacity as such, but solely in regard to any: (a) **Securities Claim**; or (b) other **Claim** so long as such other **Claim** is also made and continuously maintained against an **Executive** of an **Organization**; or

(iii) with respect to any **Outside Entity Executive**, by **such Outside Entity Executive** in his or her capacity as such or any matter claimed against such Outside Entity Executive solely by reason of his or her status as such; or

(2) with respect to an **Organization**, any actual or alleged breach of duty, neglect, error, misstatement, misleading statement, omission or act by such **Organization**, but solely in regard to a **Securities Claim**.

Id. at 10–11.

2. *The Insurance Dispute*

In November 2007, a securities class action was filed against Freddie Mac and several of

its employees in the Southern District of New York.  Compl. ¶ 36.  Freddie asserts that, in

response, it immediately began incurring costs to retain outside counsel, collect and store

documents, and establish a Special Litigation Committee.  Id. ¶ 37.  Over the next four years,

Freddie became the subject of eleven other civil suits, all arising from alleged misrepresentations

Freddie and its employees were said to have made about its exposure to subprime mortgages,

risk management controls, underwriting standards and practices, capital adequacy, and loan loss reserves.  Id. ¶ 36.  Freddie has now resolved all but one of these lawsuits.  Id. ¶ 44.

In September 2008, the SEC opened an investigation into Freddie, which Freddie says focused on the same allegations as the civil lawsuits and shareholder demand letters.  Id. ¶ 38.  That month, the SEC sent Freddie a letter, which Freddie quotes as saying that the SEC was "conducting an inquiry to determine whether there has been any violation of the federal securities laws in connection with the accuracy of the financial statements and other public disclosures made by [Freddie Mac] for the period July 1, 2007 through September 7, 2008."  Id. (alteration in original).  In early 2009, the SEC issued an Order related to this investigation.  Id. ¶ 39.  Freddie asserts that the Order was titled "Order Directing Private Investigation and Designating Officers to Take Testimony in the Matter of Freddie Mac" and stated that "Freddie Mac" and "its officers, directors, employees, partners, subsidiaries, and/or affiliates, and/or other persons or entities" may have violated securities laws.  Id.

Later that year, Freddie recounts, the SEC began serving subpoenas on its employees, ultimately demanding that 36 of them produce documents and submit to sworn interviews.  Id. ¶ 40.  Freddie asserts that, pursuant to these 36 subpoenas, between June 2009 and December 2010, its employees made at least 27 document productions and appeared for 44 interviews.  Id.

In March 2011, Freddie states that the SEC issued "Wells Notices" to Freddie the entity and three of its employees informing them that the SEC's Enforcement Division was recommending an SEC enforcement proceeding for their alleged violations of securities laws.  Id. ¶ 41.

In December 2011, the SEC ended its investigation.  Id. ¶ 41.  It reached a nonprosecution agreement with Freddie and then filed suit against three Freddie employees who

had been subpoenaed as part of the investigation.  Id. ¶ 43 (citing SEC v. Syron, No. 11-cv-09201 (S.D.N.Y.)).

Freddie claims to have spent over $145 million defending the civil lawsuits, the SEC investigation, and the SEC lawsuit.  Mot. at 5.  It asserts that it indemnified its employees for their costs arising from the SEC investigation and lawsuit.  Mot. at 8.  And it alleges that, because there was so much overlap between the subject matter, witnesses, and documents involved in the civil lawsuits, the SEC investigation, and the SEC lawsuit, the same counsel represented it in all three matters, and work done on one matter served the others.  Id.; Compl. ¶ 42.

Freddie naturally sought coverage for these costs.  See Compl. ¶¶ 44–45.  Freddie's primary and first through fourth-level excess insurers all paid to their policy limits, which amounted to approximately $85 million in coverage.  Id. ¶¶ 46–49; see also June 2007–2008 D&O Coverage Tower.  Freddie applied $14 of the $15 million it received from American Casualty, its third-layer insurer, to its "earliest incurred costs," see Compl. ¶ 48, some of which predated the SEC subpoenas, Opp. at 9.

After the primary and first four excess policies had been exhausted, certain e-discovery costs, legal fees, and other defense costs—including those associated with the SEC subpoenas—remained.  Compl. ¶¶ 50–51.  Almost all these costs were incurred during the pendency of the SEC investigation.  Id.  Hartford, the fifth-layer insurer, paid Freddie $7.3 million for costs incurred after the SEC investigation ended but refused to acknowledge coverage for costs incurred while the SEC investigation was ongoing ("the Unreimbursed Costs").  Id. ¶¶ 17, 52. AXIS, HCC, and Lloyd's similarly refused coverage for the Unreimbursed Costs.  Id. ¶ 53.  They argue that the Unreimbursed Costs were incurred in connection with an SEC investigation of

Freddie *the entity*, but their "narrow insuring agreement[s]" only "provide[] coverage . . . for investigations of individuals." Opp. at 1.

B. Procedural Background

Freddie Mac filed suit against Hartford, AXIS, HCC, and Lloyd's seeking a declaratory judgment ordering them to pay the Unreimbursed Costs and damages for breach of the duty of good faith and fair dealing, as well as damages against Hartford for breach of contract. Compl. ¶¶ 55–73. As of October 2023, the Unreimbursed Costs totaled $33.6 million. Mot. at 4 n.4. AXIS, HCC, and Lloyd's answered and denied Freddie Mac's claims. See ECF Nos. 17 (AXIS Answer), 21 (HCC Answer), 19 (Lloyd's Answer). Hartford answered, denied the claims, and counterclaimed for a declaratory judgment that any costs related to Freddie alone were outside the scope of coverage; recoupment of costs it had already paid; and breach of an allocation provision in the Policies, which states:

> With respect to: . . . **Defense Costs** Jointly incurred by . . . any **Organization** and any **Insured** in connection with any **Claim** other than a **Securities Claim**, any such **Organization** and any such **Insured** and the **Insurer** agree to use their best efforts to determine a fair and proper allocation of the amounts as between any such **Organization**, any such **Insured** and the **Insurer**.

See ECF No. 23 (Hartford Answer & Countercl.) ¶¶ 56–83 (citing National Union Policy at 11). Freddie subsequently settled with Hartford, see ECF No. 40 (Notice of Settlement Between Plaintiff and Twin City Fire Insurance Company), and AXIS, see ECF No. 45 (Notice of Settlement Between Plaintiff and AXIS Reinsurance Insurance Company), so only HCC and Lloyd's remain in the case.

Freddie now moves for partial judgment on the pleadings under Rule 12(c). Mot. at 1. It contends that, first, receipt by an Insured Person of an SEC subpoena triggers coverage under the Policies, and second, the Defendant Insurers cannot contest the exhaustion of American

Casualty's third-layer excess policy.  Id.  The Defendant Insurers retort that a subpoena from the SEC is not enough to obligate coverage—instead, Freddie must show that the subpoena recipient was the subject of an SEC investigation for his or her wrongful act.  Opp. at 1–2.  And they maintain they can challenge whether American Casualty's policy was properly exhausted as necessary to trigger their coverage duties.  See Opp. at 3.

## II.    Legal Standards

"After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  To prevail, the movant must prove that there is no material fact in dispute and they are entitled to judgment as a matter of law.  Samuels v. Safeway, Inc., 391 F. Supp. 3d 1, 2 (D.D.C. 2019) (Cooper, J.) (citing Schuler v. PricewaterhouseCoopers, LLP, 514 F.3d 1365, 1370 (D.C. Cir. 2008)).  "When evaluating a motion for judgment on the pleadings, inferences should be drawn and facts should be viewed in the light most favorable to the non-moving party."  Id. (citing Peters v. Nat'l R.R. Passenger Corp., 966 F.2d 1483, 1485 (D.C. Cir. 1992)).

The parties agree that, under a choice-of-law clause, Virginia law applies to interpreting the D&O policies.  See Compl., Ex. 2 (National Union Policy Endorsements) at 33 (page numbers designated by CM/ECF); Compl. ¶ 34; Opp. at 10, n.6.  Like other contracts, insurance policies must be construed as a whole.  Premier Pet Prods., LLC v. Travelers Prop. Cas. Co. of Am., 678 F. Supp. 2d 409, 417 (E.D. Va. 2010).  And, because insurance policies are generally drafted by insurers, ambiguities in them are generally construed in favor of the insured.  TravCo Ins. Co v. Ward, 736 S.E.2d 321, 325 (Va. 2012).

### III.  Analysis

The Court has jurisdiction under Freddie Mac's governing statute, 12 U.S.C. § 1452(f).

A.  Coverage for SEC Subpoenas

The first dispute here is about what requirements are necessary to establish coverage for Freddie's costs associated with an SEC subpoena issued to an indemnified Freddie employee. Freddie contends that the issuance of an SEC subpoena to a Freddie employee alone triggers coverage; the Defendant Insurers disagree, arguing that Freddie must also show that the subpoena recipient was the subject of an SEC investigation for his or her wrongful act.  The Defendant Insurers have the better of the argument.

As described above, the "Organization Insurance" section of Policies provide Freddie two types of coverage: entity coverage (coverage for "a Securities Claim made against such Organization for any Wrongful Act of such Organization") and indemnified employee coverage (coverage for indemnified costs resulting from "a Claim made against an Insured Person . . . for any Wrongful Act of such Insured Person").  National Union Policy at 1 (boldface omitted). Taking entity coverage first, the parties agree that, under the Policies' definition of a Securities Claim, costs associated with an investigation of Freddie the entity are covered only if a Freddie employee is also being investigated at the same time.  See Mot. at 1–2; Opp. at 5.  In dispute here is the scope of indemnified employee coverage—in particular, what exactly constitutes a "Claim," which the Policies define as:

> a civil, criminal, administrative or regulatory investigation of an Insured Person:
>
> (i)     once such Insured Person is identified in writing by such investigating authority as a person against whom a proceeding described . . . [elsewhere] may be commenced; or

> (ii)     in the case of an investigation by the SEC or a similar state or foreign
>          government authority, after the service of a subpoena upon such Insured
>          Person.

National Union Policy at 2 (boldface omitted).

Freddie lasers in on the fact that indemnified employee coverage begins "in the case of an investigation by the SEC . . . after the service of a subpoena upon such Insured Person." See id. (boldface omitted). It reads this language to establish that an SEC subpoena of an employee is per se a claim. Mot. at 12. But this language must be read in the context of the entire policy, including its distinction between SEC investigations of Freddie employees, which are covered, and SEC investigations of Freddie the entity, which are covered only if the SEC is also simultaneously investigating a Freddie employee. When viewed in this light, the Defendant Insurers' interpretation prevails.

Receipt of an SEC subpoena may indicate an ongoing investigation by the SEC. But, absent the subpoena itself or any evidence of its surrounding circumstances, it is unclear whether that investigation is of a Freddie employee or Freddie the entity. And if that investigation is against Freddie the entity, and there is no simultaneous investigation of a Freddie employee, then there is no coverage.

The Defendant Insurers sharpen the point by positing a hypothetical subpoena served on an employee that states: "The SEC is not investigating you personally; rather, it is investigating Freddie Mac and requests any relevant documents in connection with its investigation of Freddie Mac." Opp. at 13. This subpoena would trigger coverage under Freddie's interpretation of the Policies. Yet that result would be contrary to the Policies' different coverage for employees and entities and therefore inconsistent with the policy as a whole.

Freddie responds that "SEC investigations of companies do not have to be conducted via employee subpoenas" because "[t]he SEC possesses (and often exercises) the power to issue subpoenas to the company itself." Reply at 9. But just because the SEC *can* investigate the company through a corporate subpoena does not mean that the SEC would not *also* do so through subpoenas to the company's employees. At this stage, when the only materials before the Court are the parties' pleadings, which do not attach the subpoenas at issue, the Court has no way to assess whether the subpoenas related to an investigation into Freddie employees or Freddie itself.

Freddie also points to the Policies' special treatment of SEC investigations: While, for other claims, an employee must be "identified in writing" as the subject of a proceeding, in the case of an SEC investigation, Freddie argues, a subpoena is enough. Id. at 12–13. Freddie maintains that this differential treatment makes practical sense because the SEC "does not actually identify specific, individual targets" in its investigations "beyond issuing such orders and subpoenas." Id. at 15 n.14. But, even if a subpoena did not "identify [a] specific[] target," id., it could contain facts that would shed light on the nature of the investigation at issue.

Absent the content of the subpoenas, moreover, it remains unclear whether there is evidence of an alleged "Wrongful Act" as necessary to establish coverage under the Policies. BioChemics, Inc. v. AXIS Reinsurance Co., 924 F.3d 633 (1st Cir. 2019), is instructive on this point. There, the First Circuit affirmed summary judgment in favor of a defendant insurer in part on the ground that a subpoena was a "component" of a claim within the meaning of the policy, not a claim in and of itself. Id. at 640–41. The policy language at issue in BioChemics specifically required SEC subpoenas to "identify[] [the] Insured" in writing, whereas these Policies do not. Id. at 638. But the First Circuit also noted that "even if [it] assumed that

subpoenas are 'Claims' in their own right, that conclusion does not, on its own, imbue them with 'actual or alleged' 'errors' such that they state 'Wrongful Acts' . . . under the Policy." Id. at 641 n.5.  Likewise, on the pleadings before the Court, it is unclear whether the subpoenas (or other documents arising from the SEC investigation) allege a "Wrongful Act" as necessary to make out a "Claim" under the Policies.

Finally, Freddie advances an alternative argument that, even under the Defendant Insurers' interpretation, "undisputed evidence confirms that the SEC was investigating Insured Persons who received subpoenas."  Reply at 13; see also Mot. at 14–16.  But this issue is better adjudicated after discovery, when Freddie will have the opportunity to show, through actual evidence, that the subpoenas of its employees were part of an investigation into its employees, not just Freddie.  As of now, the SEC letter, subpoenas, Order, and Wells Notices are not before the Court.  And, tellingly, the central case Freddie cites, Office Depot, Inc. v. National Union Fire Insurance Co. of Pittsburgh, 734 F. Supp. 2d 1304 (S.D. Fla. 2010), was decided on summary judgment, with the court having actual evidence of the subpoenas and investigative materials at issue.  Id. at 1307, 1311–12.

Accordingly, the Court agrees with the Defendant Insurers' interpretation of the relevant policy provisions.  Discovery will determine whether the SEC was investigating Freddie employees for their wrongful acts as necessary to establish coverage for Freddie's indemnification of the employees' costs.

B.  Challenging an Underlying Payment

Freddie Mac also seeks a judgment declaring that the Defendant Insurers cannot challenge the third-layer insurer American Casualty's $15 million tender, $14 million of which

Freddie allocated to losses the Defendant Insurers claim were uncovered. <u>See</u> Opp. at 21. The Court will grant judgment in Freddie's favor on this issue.

Whether an excess insurer can challenge an underlying insurer's payment as outside the scope of coverage appears to be a matter of first impression in this Circuit and under Virginia law. "[T]he limited caselaw that has addressed this issue," however, has consistently held that "excess insurers generally may not avoid or reduce their own liability by contesting payments made at prior levels of insurance, unless there is an indication that the payments were motivated by fraud or bad faith" or there is "specific language in [the] policies reserving a right to challenge prior payments[.]" <u>AXIS Reinsurance Co. v. Northrop Grumman Corp.</u> ("<u>Northrop Grumman</u>"), 975 F.3d 840, 844 (9th Cir. 2020); <u>see also</u>, <u>e.g.</u>, <u>Costco Wholesale Corp. v. Arrowood Indem. Co.</u>, 387 F. Supp. 3d 1165, 1173 (W.D. Wash. 2019) ("[T]he weight of authority holds that an excess insurer may not challenge the underlying insurers' payment decisions in order to argue that their policy limits were not (or should not have been) exhausted."); <u>Edward E. Gillen Co. v. Ins. Co. of Pennsylvania</u>, No. 10-C-564, 2011 WL 1694431, at *4 (E.D. Wis. May 3, 2011) ("[A]n excess liability insurer cannot avoid or reduce liability under its own policy by challenging a separate insurer's decision to settle or pay out claims at a prior layer of insurance.").

The Court agrees with these authorities that excess insurers cannot avoid their obligations by arguing that underlying coverage was improperly eroded. This rule promotes finality and settlement. It also makes sense given the nature of a layered insurance structure, within which each insurer is independent. <u>Cf.</u> <u>Allmerica Fin. Corp. v. Certain Underwriters at Lloyd's</u>, 871 N.E.2d 418, 426 (Mass. 2007) ("[P]rimary and excess insurers act independently of each other with respect to decisions about their policies, including coverage determinations and

settlements," and are not bound "to a form of joint liability should coverage at a prior layer fail" because "[t]he layer of risk each insurer covers is defined and distinct.").

The Defendant Insurers suggest that they do not fall under this rule because American Casualty likely made "an unallocated compromise payment," which Freddie "then applied . . . to fees and costs that do not constitute covered **Loss** and thus do not erode the underlying insurance." Opp. at 21. In other words, the Defendant Insurers assert that they are not second-guessing American Casualty's payment decision because American Casualty never made a specific determination to cover certain costs. Instead, Freddie decided how to allocate the payment.

The caselaw is less clear on whether an excess insurer can challenge a payment by a lower-level carrier to settle a claim by the insured without an agreement as to which types of losses the payment would cover. But the Court concludes that the same policy justifications bear on that situation as where an underlying insurer designates a specific purpose for a payment, so the same prohibition on excess-insurer challenges to such payments should also apply. In both instances, allowing higher-layer excess carriers to challenge these payments would encourage litigation, delay the resolution of claims, and undermine the discretion of lower-layer carriers to settle claims within their limits. Moreover, as the Ninth Circuit articulated in Northrop Grumman, absent fraud or bad faith, it is unlikely "that there are many instances where an insurance company will pay out claims—let alone its policy's limit—when it is not obligated to do so[.]" 975 F.3d at 847. But "even if . . . insurers sometimes choose to settle claims that fall outside their scope of coverage 'for what they perceive[] as legitimate business reasons,' nothing prevents . . . [an] excess insurer from raising and leveraging this concern during contractual negotiations with their policyholders." Id. (second alteration in original). So, an excess carrier

can price this risk into its policy with the insured by charging a higher premium or specifically contracting for the right to challenge underlying payments.

The Defendant Insurers alternatively suggest that they took such precautions, as reflected in "specific language in their policies reserving a right to challenge prior payments."  Id. at 844. Namely, the Defendant Insurers argue, the Policies provide that the excess insurers would be liable only after the primary and underlying excess insurers had paid the full amount of their own liability limits for covered "Loss."  Opp. at 22–23.  Of the two Defendant Insurers left in this case, only HCC's policy actually uses the term "[l]oss[]" when explaining its obligation; it states that "coverage hereunder shall attach only after all Underlying Insurance has been exhausted by actual payment of claims or losses thereunder."  Compl., Ex. 5 (HCC Policy), at 7 (page numbers designated by CM/ECF).  However, the Lloyd's policy contains a substantively similar provision:  "The Underwriters' liability to pay under this Policy shall attach only when the Underlying Insurer(s) shall have paid or have been held liable to pay, the full amount of the Underlying Limit(s)[.]"  Compl., Ex. 6 (Lloyd's Policy), at 6 (page numbers designated by CM/ECF).  The Court therefore will consider the Defendant Insurers' argument that, given these provisions, Freddie bears the burden of showing that the American Casualty policy was properly exhausted.

Other courts presented with similar arguments have found this type of language insufficient to alter the default rule that excess insurers cannot challenge underlying insurers' payments.  In Northrop Grumman, for example, the policy at issue required the excess insurer "to 'drop down' to provide coverage only when the . . . liability limit of the underlying insurance policies was exhausted for 'covered loss.'"  975 F.3d at 843.  But the Ninth Circuit determined

that there was "no indication" that this "'covered loss' provision" indicated the parties' intent to "contract around th[e] general rule." Id. at 844.

Likewise, the court in Costco considered a policy establishing an excess insurer's coverage obligations "[i]n the event and only in the event of the reduction or exhaustion of the Underlying Limit by reasons of the insurers of the Underlying Policies paying in legal currency Loss." 387 F. Supp. 3d at 1173–74. The court acknowledged that unpublished decisions from Minnesota had interpreted such language to require the insured "to show that the payments that were made fit within the policy definition of 'Loss[.]'" Id. at 1174 (quoting Royal Indem. Co. v. C.H. Robinson Worldwide, Inc., No. A08-0996, 2009 WL 2149637, at *2 (Minn. Ct. App. July 21, 2009)). But it eschewed this approach, concluding instead that the "Loss" language at issue was ambiguous and therefore should be construed in favor of the insured. Id.

Here, the Court also sees no indication that the parties mutually intended to contract around the default rule. The language requiring exhaustion of the underlying levels of insurance is likely standard fare in most excess insurance contracts, which by their nature obligate coverage only when the underlying limits have been paid. Nothing more specific in the Policies suggests that the parties intended these provisions to have the broader effect the Defendant Insurers advance. And, even if these provisions were ambiguous, the interpretive tie would go to Freddie under the default rule that ambiguities in contracts are construed against the drafter. See TravCo Ins. Co., 736 S.E.2d at 325. Accordingly, the Court will grant Freddie's motion on this second issue and hold that the Defendant Insurers cannot challenge American Casualty's payment.

**IV.    Conclusion**

For these reasons, it is hereby

**ORDERED** that [ECF No. 31] Plaintiff's Motion for Partial Judgment on the Pleadings is GRANTED in part and DENIED in part.  It is further

**ORDERED** that the parties shall submit, by November 22, 2024, a Joint Status Report on the need for further proceedings in this matter.

**SO ORDERED**.


_____
CHRISTOPHER R. COOPER
United States District Judge

Date:  November 8, 2024